# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>1.604 ACRES OF LAND, MORE OR LESS,<br>SITUATE IN THE CITY OF NORFOLK,<br>COMMONWEALTH OF VIRGINIA, AND 515<br>GRANBY, LLC., et al. ,<br>*Defendants.* | CASE NO. 2:10-cv-00320<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon several pretrial motions filed by Plaintiff and Defendant on March 21, 2011 (docket nos. 130-37, 139-42). Briefing has been completed, and five motions (docket nos. 136, 137, 139, 141, 142) were heard on April 18, 2011. A jury trial is set for May 18-20, 2011. This memorandum opinion sets forth the Court's ruling on the pretrial motions that were argued at the hearing.

## I. BACKGROUND AND FINDINGS OF FACT

This is a land condemnation action initiated by Plaintiff United States on July 1, 2010 to take the parcel of land designated "1.604 Acres of Land, More or Less, Situate in the City of Norfolk, Commonwealth of Virginia" ("the property") for the purpose of constructing an annex to the Walter E. Hoffman United States Courthouse (docket no. 1).[1] The property is located in downtown

---

[1] The action was filed in the United States District Court for the Eastern District of Virginia, Norfolk Division. Upon the recusal of District Judge Robert C. Doumar, I was designated to preside over the proceeding.

Norfolk, Virginia, across the street from the existing federal courthouse, at the southwest corner of Granby Street and Brambleton Avenue. The defendants claiming interest in the property are 515 Granby, LLC ("Defendant"), which is the fee owner of the property, and Marathon Development Group, Inc. ("Marathon"), which was hired by Defendant to manage development of the property.

Defendant acquired and assembled the property in three separate transactions. The first parcel was purchased on August 27, 2003, the second parcel was purchased on May 24, 2004, and the third parcel was conveyed via quitclaim deed subject to certain conditions and consideration by the City of Norfolk on November 9, 2005. In July 2004, Defendant publicly announced its intention to erect a single-building, mixed-use, 31-story, high-rise, luxury condominium complex; the development became known as Granby Tower. Granby Tower would offer approximately 292 to 311 condominium units for sale, as well as leased retail and office space. Development and site work was underway by mid-2005, when a series of news articles reported that the federal government was considering acquiring the property to site an extension of the existing federal courthouse. For example, the front page headline of the July 12, 2005 edition of *The Virginian-Pilot*, a newspaper serving Norfolk and the greater region, read "Feds hover over Granby site," and the July 13, 2005 edition contained an article entitled "Feds admit an interest in site set for Granby Tower."

Despite the federal government's focus on the property, no final decision was made with regard to acquisition in the summer of 2005, and Defendant proceeded forward with its plans for developing the property. Garrison Partners, Defendant's exclusive sales and marketing consultant, conducted marketing outreach in anticipation of the "grand opening" sales event scheduled for

September 2005.[2]  By late summer, there were more than 1200 names on a list of invitees for the grand opening event.  More than 700 people attended the grand opening, and more than 150 appointments were made for customers who wished to leave a deposit to purchase a residence at Granby Tower.  In the weeks following the grand opening, approximately 100 reservation deposits were taken, and from these, 44 sales contracts for approximately $28 million were written.  In the three months following the grand opening, approximately 56 sales contracts for approximately $35 million were written.  Twelve sales valued at approximately $7 million canceled shortly after time of contract.  Each sales contract contained a "condemnation clause" that allowed the seller to terminate the agreement if the property was taken by eminent domain.

In addition to generating sales, Defendant sought financing for the development in the fall of 2005.  A construction loan term sheet from Wachovia Securities outlined a proposed $110 million construction loan to finance a portion of Granby Tower.  To close the loan, Defendant was required to obtain at least 156 binding, qualified sales contracts for sales totaling not less than $81 million by March 31, 2006.[3]  Defendant only had approximately 64 contracts in place as of that date, and the loan never closed.

On August 31, 2006, *The Virginian-Pilot* reported that the federal government was no longer considering taking the property slated for Granby Tower, having instead decided to expand the courthouse by building additional stories on the existing property.  Harry Minium, *It's up, not out, for courthouse*, THE VIRGINIAN-PILOT, Aug. 31, 2006, at A1.

---

[2] The grant opening event was for presales of condominium units.  Actual construction of Granby Tower had barely commenced at that time.

[3] These contracts were required to be "arms-length contracts executed by third parties unrelated to the Borrower" that included a "non-refundable deposit in an amount not less than 10% of the unit's gross sales price."

I take judicial notice of the fact that the housing market was at its peak in approximately 2005-2006, and then collapsed along with a collapse in the credit markets. The United States entered a recession in late 2007. Over this period, Defendant continued to make efforts to secure financing for construction, eventually beginning construction on Granby Tower in July 2007 with a $145 million construction loan from Stonington Capital LLC. Defendant had to halt construction in September 2007, however, because Stonington Capital could not fulfill its obligations under the loan. At the time, Defendant attributed its lender's difficulties to "global credit adjustments now affecting world banking markets." On January 31, 2008, Defendant wrote its general contractor: "We certainly had no way to forecast this downturn which has resulted in [a] number of large projects in the Hampton Roads area to either be delayed or canceled due to funding issues. All the while we have worked diligently to pursue partnerships and funding resources to save the Granby Tower project from becoming a causality [sic] of the funding crisis facing the market place." Adequate financing was never obtained, despite Defendant's pursuit of over 100 lenders, brokers, and other funding sources from 2004 to 2009. Condominium sales continued until January 2008; approximately 124 units were sold in total. In March 19, 2009, minutes from a meeting of Defendant's representatives stated that "[Defendant's] intent remains to secure financing for the Granby Tower and move forward with the project. However depending on timing and market conditions [Defendant] is prepared to hold the property until more favorable conditions present themselves."

Meanwhile, the federal government reversed course and began negotiations in spring of 2008 to purchase the property for its courthouse expansion. On October 19, 2009, the government made its final offer to purchase the property, which was not accepted. The government then sent a letter

dated November 23, 2009 formally notifying Defendant of its intention to take the property. The government did not actually acquire title to the property until it instituted this condemnation proceeding on July 1, 2010. As of that date, all sales contracts for condominium units in Granby Tower had been canceled. Defendant does not dispute the government's authority to take the property, leaving as the sole disputed issue the amount of compensation due. The date of taking is July 1, 2010.

## II. Defendant's Motion for Ruling on the Scope of the Project Rule (Docket no. 136) and Plaintiff's Rule 71.1(h) Motion to Exclude from Evidence Allegations of Government Interference and Project Influence (Docket no. 137)

Defendant requests the Court to allow the jury to consider evidence that the federal government's interest in acquiring the property in July 2005 affected the value of the property, and to instruct the jury to disregard any decrease in value of the property caused by public knowledge of the possibility of the property's condemnation. Plaintiff, on the other hand, entreats the Court to exclude from jury consideration all evidence relating to the federal government's alleged interference with or influence on the property prior to the date of taking. Both parties agree that market data of comparable sales relied upon by their appraisal experts is unaffected by any government influence. Rather, Defendant contends that the public project contemplated by the government interfered with the financial success of its planned development of the property, which affects the highest and best use of the property and other aspects of the appraisal valuation. These arguments turn on the applicability of the "scope of the project" rule.

The Constitution requires the landowner to be provided "just compensation" for the taking of its property. Just compensation "means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his

property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943). The measure of compensation is the fair market value of the property as of the date of taking. *Id.* at 374. The landowner bears the burden of proving the value of the land taken. *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991) (citing *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 274 (1943)).

The general rule stated above is subject to modification where the market value of the property condemned is affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary. *United States v. Reynolds*, 397 U.S. 14, 16 (1970). To permit compensation to be either reduced or increased because of an alteration in market value attributable to the government project itself would not lead to just compensation. *Id.* This requirement is known as the "scope of the project" rule. The rule protects landowners from being forced to shoulder the burden of depreciation attributable to a condemnation project. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 (1973). The Supreme Court of the United States has acknowledged that it would be improper for the government to depreciate property values by the threat of condemnation and then take advantage of the depressed market when the property is actually condemned. *See United States v. Va. Electric & Power Co.*, 365 U.S. 624, 636 (1961).

The principle underlying the scope of the project rule has been codified in federal government condemnation practice. In determining the just compensation due for property acquired by the United States or any of its agencies by eminent domain, appraisers are directed to disregard

> [a]ny decrease or increase in the fair market value of real property
> prior to the date of valuation caused by the public improvement for
> which such property is acquired, or by the likelihood that the property
> would be acquired for such improvement, other than that due to

physical deterioration within the reasonable control of the owner . . . .

42 U.S.C. § 4651(3).

Under Federal Rule of Civil Procedure 71.1(h), determination of any scope of the project issue is the province of the judge, not the jury. *See Reynolds*, 397 U.S. at 19-20 ("[I]t is for the judge to tell the jury the criteria it must follow in determining what amount will constitute just compensation, and that in order to do so he must decide the 'scope-of-the-project' issue as a preliminary matter."); *see also United States v. 320.0 Acres of Land*, 605 F.2d 762, 809 (5th Cir. 1979) (stating that the judge decides "whether the evidence warrants application" of the scope of the project rule and "whether or not any change in value attributable to the project should be included or disregarded"). Once the judge decides the scope of the project rule applies and sets the criteria for its application, it is for the jury to decide whether there in fact has been any increase or decrease in value due to the project, and by how much, on the basis of the evidence presented it. *320.0 Acres of Land*, 605 F.2d at 809.

Courts have held that the following three legal requirements must be met to constitute a project under the scope of the project rule: (1) there must be a public purpose requiring the acquisition of land; (2) the particular lands required for the public purpose must be identified; and (3) such imminent acquisition must be evident to the public. *See United States v. 49.01 Acres of Land*, 669 F.2d 1364, 1367-69 (10th Cir. 1982); *United States v. 62.17 Acres of Land*, 538 F.2d 670, 677-80 (5th Cir. 1976). This test derives from statements of the Supreme Court on the scope of the project rule. *See Miller*, 317 U.S. at 377 (asking "whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it"); *Reynolds*, 397 U.S. at 21 ("The rule does not require a showing that the land ultimately taken was actually specified

in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.").  In order to allow a claim that the government's project influenced the market value of the subject property to go before a jury, the landowner must present sufficient evidence that the government's project had a market impact on the subject property.  *See 320.0 Acres of Land*, 605 F.2d at 808 ("What the trial judge decides, essentially, is whether . . . the jury is to consider any alterations in value attributable to the Government project for which the condemned property is taken."); *cf. 49.01 Acres of Land*, 669 F.2d at 1368 (imposing a "heavy burden" on landowner to show that property was within the scope of the project).

The parties dispute in this matter whether the federal government's *imminent* acquisition of the property was evident to the public in July 2005.  The evidence on this point is conflicting. Neither of the articles in *The Virginian-Pilot* dated July 12 and 13, 2005 demonstrate that the government was committed to acquiring the property as of that date.  The articles reported that the government was "focusing on" the property and admitted "an interest" in the property.  Later news reports are relatively consistent in reporting that the government was seriously considering acquiring or purchasing the property, but that it had not made a final decision and continued to search for alternative sites for the courthouse expansion.  *See*, *e.g.*, Chris Hopkins, *Government Officials Consider Condemning Granby Towers Project*, WTKR NEWSCHANNEL 3, July 13, 2005, http://wtkr.com/Global/story.asp?S=3585472&nav=0oa7c3at (reporting that the government would contact 515 Granby within three weeks with a final decision about the property); Harry Minium, *Federal agency still has eye on site for Granby Tower*, THE VIRGINIAN-PILOT, Aug. 3, 2005, at A1 (reporting that the government was not ruling out alternative sites and that 515 Granby was still

optimistic the government would not condemn the property).

On the other hand, a letter the government sent to the mayor of Norfolk to follow up on a July 15, 2005 meeting showed a firm commitment by the government to acquire the property in the near future. In that letter, the government stated that government officials "reluctantly have reached the conclusion that the most advantageous site upon which to build the new federal courthouse building" was the site of the subject property. The letter also stated that officials notified the city and the developers of its "selection as soon as a final decision was made" and that officials' "resolution to build on the [site of the subject property] compelled us to move forward now, before ground is broken for other projects." In addition, that Defendant felt compelled to include a clause in its condominium sales contracts providing for cancellation should the property be condemned indicates that Defendant and potential purchasers believed government acquisition of the property was possible. Of course, that point must be weighed against the fact that Defendant proceeded with its plans to develop the property in spite of the government's focus on it.

I need not resolve whether imminent acquisition of the property was evident to the public in July 2005 because there is scant evidence that the government's actions actually affected the market value of the property. Defendant relies largely on opinion testimony from four expert witnesses to show that the government's consideration of the property in July 2005 caused the property value to depreciate. The first witness, Sandra S. Lent, is a senior partner at Garrison Partners and directed the presale efforts to market Granby Tower. According to her report, she is prepared to testify that the news of the government's interest in acquiring the property that broke in mid-July 2005 "spread through the community" and eroded confidence with many potential purchasers. This interference "diminished the attendance at the grand opening gala and greatly diminished the sales potential for

the project." Although the grand opening "was attended by more than 700 people and was the most remarkable occasion of its kind in the history of Norfolk, or the surrounding cities," "sales staff members were confronted frequently about the [government's] threat to condemn the Granby site" and the threat of condemnation became "the single greatest detriment to making and retaining sales for Granby Tower." More specifically, Ms. Lent asserts that an unusually large number of initial reservation deposits canceled before signing contracts, and that an unusually large number of purchasers who signed contracts canceled them shortly thereafter. She concludes that "without the actions of the [government], we would have successfully met sales absorption expectations sufficient to satisfy requirements for obtaining financing for [Granby Tower]."

The second witness relied on by Defendant, Lin Miller, is a real estate professional familiar with the Norfolk real estate market. According to a letter outlining his opinion, he asserts that the news of the government's interest in the property "was like pouring ice water over the heads of potential buyers" and caused several people who were considering purchasing condominiums at Granby Tower to look elsewhere. Potential purchasers were discouraged by the "requirement of very large escrows being held coupled with the uncertainty of a delivery date for the completed building." It is his opinion that but for the government's interference, Granby Tower would have been built. Mr. Miller's opinion is based on his own experience and conversations he had at the time; he did not refer to any studies or analyses in reaching his conclusion. At his deposition, Mr. Miller could only name two individuals who moved elsewhere because of the threat of condemnation, and one of those individuals, Larry Shall, actually purchased a condominium at Granby Tower valued at $871,900 on November 6, 2005. Mr. Shall's contract was not canceled until 2009, so it would have counted toward the sales needed to meet the Wachovia term sheet

financing requirements.

Defendant's third witness, Vincent J. Mastracco Jr., is an attorney with Kaufman & Canoles, P.C. who represented Defendant in creating the legal and capital structure of Granby Tower. According to his report, Mr. Mastracco is also "an investor in various real estate enterprises that deal in both the residential and commercial markets." It is Mr. Mastracco's opinion that Granby Tower "would have been incredibly successful but for the interference by the Federal Government and the cloud of condemnation that permeated the project." More specifically, it is Mr. Mastracco's opinion that the uncertainty in the minds of potential purchasers created by the government prevented Defendant from generating sufficient presales to meet the requirements for financing. Mr. Mastracco attests that he is "personally aware of purchasers who were negatively influenced from buying condominium units because of the threat of condemnation." At his deposition, he could not provide any names of purchasers with whom he spoke. Mr. Mastracco's opinion is based on his own experience; he did not refer to any studies or analyses in reaching his conclusion.

The fourth witness, Dennis W. Gruelle, is a Virginia real estate appraiser with experience in the Norfolk area. According to his report, it is his opinion as an appraiser that the government's interest in acquiring the property "substantially interfered with" and "delayed" the development of Granby Tower, resulting "in a diminution in the value of the property and substantial loss of momentum." His opinion is based on personal knowledge and information from market participants and public press reports.

Defendant's attempt to pin its failure to meet the Wachovia term sheet requirements for the construction loan on the government is belied by sales forecasts prepared before the government's involvement. First, a strategic market analysis prepared for Marathon by Robert Charles Lesser &

Co., LLC, dated April 26, 2005, estimated that Granby Tower would achieve 90 to 135 sales per year or more, or approximately 7.6 to 11.5 sales per month. But at that rate, Defendant would not come close to satisfying the Wachovia term sheet sales requirement, which required sales of 156 units within six months. Second, a sales and marketing agreement between Defendant and Shoreline Marketing, Inc., dated June 30, 2005, allowed cancellation of the agreement if sales figures did not meet a percentage of the projected absorption schedule, which was attached to the agreement. The absorption schedule projected sales of 62 condominium units through six months and 124 total sales through the first year. Again, if Defendant achieved this level of sales, it would not have met the financing requirements.

The pre-July 2005 forecasts are relatively consistent with each other and fairly accurate when compared with Defendant's actual sales of 64 units in the first six months. The sales performance of Granby Tower is also consistent with the pace of condominium sales in the five similar, competing developments identified by Defendant's appraiser. Like Granby Tower, sales performance at all five competing condominium developments suffered a marked, similar decline after their initial sales offering. Defendant has not supplied any evidence that gives me reason to believe its sales performance would have significantly exceeded that forecasted or that achieved by competing developments. This data casts serious doubt on the experts' opinions that Defendant would have achieved at least 156 sales within the first six months.

Another factor cutting against Defendant's position is that the timing of the first media reports of the government's focus on the property does not align with Defendant's sales difficulties. The government's interest in the property was disclosed near the beginning of Defendant's marketing efforts for the grand opening event. Despite this announcement, and the series of follow-

up articles that summer, significant interest in Granby Tower was generated.  For example, in an article published on August 3, 2005, Defendant stated that there were more than 800 people seriously interested in purchasing condominiums, and that "publicity about the federal government's interest in taking [the] property hasn't dampened interest in the proposed [condominiums]."  Harry Minium, *Federal agency still has eye on site for Granby Tower*, THE VIRGINIAN-PILOT, Aug. 3, 2005, at A1.  The fall 2005 grand opening was well attended and produced reservation deposits that led to 44 sales contracts for approximately $28 million.  In fact, the period closest to the news reports about the possible condemnation was the strongest period of sales in Granby Tower.  The initial withdrawals from sales contracts occurred in fall 2005 and winter 2006, well after the threat of condemnation first became public news.  These withdrawals could be due to any number of reasons; Ms. Lent only speculates that, because potential purchasers expressed concern about the possibility of condemnation, these particular withdrawals were motivated by those same fears.  Records of the reasons given by purchasers for cancelling their sales contracts do not list threat of condemnation as a reason for cancellation.[4]

Defendant's problems developing Granby Tower after the loss of financing from Wachovia are better attributed to problems in the finance market than to any influence of the government project.  When the government publicly withdrew its interest in the property in August 2006, there was no correlated increase in sales in Granby Tower.  Instead, sales continued to decline as Defendant encountered repeated obstacles in securing financing at a time when funding was short

---

[4] Defendant recorded the reasons given for the cancellation of each sales contract.  Although some reasons listed are too vague to be informative (*e.g.*, "advised by his attorney" or "uncomfortable with HUD document"), others are clearly for reasons other than uncertainty regarding condemnation (*e.g.*, "just learned he's losing his job," "price worthiness as an investment," "expanding his business and needs fund for expansion," and "uncomfortable with unknowns of property's features").

for other large development projects in the Hampton Roads region.[5] Defendant itself wrote to its general contractor on January 31, 2008 that Defendant has "worked diligently to pursue partnerships and funding sources to save the Granby Tower project from becoming a causality [sic] of the funding crisis facing the market place."

The opinions of Defendant's experts run counter to the substantial evidence cited above. Importantly, the experts did not review or address Defendant's own sales forecasts in developing their opinions. Defendant has supplied no other evidence of its pre-July 2005 sales expectations that I could use to compare with the pre-July 2005 sales forecast and absorption schedule. The experts also did not rely on any market studies to confirm their opinions, nor did they attempt to reconcile the performance of Granby Tower with that of competing developments, which also struggled to maintain sales pace in a worsening economy. Defendant's experts purport to ground their testimony in actual conversations they had with potential purchasers at the time, but these conversations were casual, not methodical, and the conclusions drawn from them are not substantiated by the other evidence in the record. For example, Ms. Lint opines that the threat of condemnation caused widespread uncertainty and became the primary obstacle to closing and maintaining sales, yet Defendant itself was quoted in a news report as saying that the threat of condemnation was not dampening interest in the development. In another instance, Mr. Miller cited conversations he had with potential purchasers who were discouraged by the threat of condemnation as the basis for his opinion, yet he could only name two potential purchasers, one of whom actually purchased a condominium in Granby Tower. Mr. Miller also opined that the large escrows discouraged potential purchasers, but Defendant does not argue that the government had anything to do with setting the

---

[5] It is entirely possible that potential purchasers of units also faced difficulties obtaining loans in this period.

– 14 –

escrow requirement. Mr. Mastracco kept no notes of his conversations and could not recollect the names of any particular individuals with whom he spoke. In sum, the opinions of the experts supplied by Defendant are without support in the record. *See United States v. Whitehurst*, 337 F.2d 765, 776 (4th Cir. 1964) (rejecting expert testimony that was based on "pure speculation" and was "without objective evidential support"). It is not worthwhile to allow the jury to entertain the possibility of government influence, given the multitude of other plausible—and more likely—explanations for the financial difficulties of Granby Tower that Defendant failed to address.

After consideration of the evidence in the record and that proposed to be offered at trial, I conclude that there is insufficient support for the contention that the government's courthouse expansion project affected the value of the property sufficient to warrant application of the scope of the project rule. Therefore, I decline Defendant's invitation to instruct the jury to consider any increase or decrease in value attributable to the government's project in its determination of just compensation. Accordingly, allegations and evidence of government interference and project influence prior to the date of taking must be excluded from trial, as well as any valuation evidence that depends on the existence of project influence for its support.

### III. PLAINTIFF'S RULE 71.1(H) MOTION TO EXCLUDE DEFENDANT'S HIGHEST AND BEST USE (DOCKET NO. 142)

Defendant claims that the highest and best use of the property is the continued development of Granby Tower, and both of its expert appraisals value the property based on that highest and best use. Plaintiff seeks to exclude the continued development of Granby Tower from consideration by the jury as the highest and best use of the property.

Just compensation is not "the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.'" *United States v. Petty Motor Co.*,

327 U.S. 372, 377 (1946). Fair market value is determined by considering the property's "highest and best use," which is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934). Without contrary proof, "the highest and best use of property is presumed to be its current use." *69.1 Acres of Land*, 942 F.2d at 292. If a landowner "posits that a different use is 'highest and best,' he must show that this use is 'reasonably probable' and that the probability has a real market value." *Id.* In order for a landowner to claim just compensation based on a proposed use, there must be evidence that the use is reasonably probable within the reasonably near future— and hence, not a speculative use. *See Olson*, 292 U.S. at 255-57. The appraiser must determine the highest and best use of the property by analyzing four criteria: whether the use is (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive. THE APPRAISAL OF REAL ESTATE 278-79 (13th ed. 2008). "[T]he trial judge has the responsibility under [Rule 71.1(h)] to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *320.0 Acres of Land*, 605 F.2d at 815; *see also United States v. Certain Land Situated in the City of Detroit*, 450 F.3d 205, 211 (6th Cir. 2006).

Defendant argues that the current use of the property is the development of Granby Tower, and on that basis urges the Court to presume that the development is financially feasible. Although Defendant was continuing to make efforts to develop the property within a year of the date of taking, no actual progress had been made since the limited construction nearly three years prior to the date of taking. Regardless of Defendant's efforts, the development was stalled. The current use of the property is as a partially improved parcel of land being held until development of the property can

move forward.  Therefore, it is incumbent on Defendant to show that use of the property for development of Granby Tower is reasonably probable within the reasonably near future.  Plaintiff argues that Defendant cannot meet this burden because the evidence shows that the development of Granby Tower was not financially feasible as of July 1, 2010.  Construction of the high-rise tower had not occurred on the property since 2007, when it halted due to lack of financing.  All of the sales contracts for units in Granby Tower had been canceled prior to the date of taking.  Citing support from the record, Plaintiff contends that the global financial crisis rendered unavailable financing for large construction projects, including Granby Tower, and economic conditions reduced demand for high-priced condominiums.

The best evidence Defendant supplies that it could finance the continued development of Granby Tower on the date of taking is that it obtained a term sheet for a loan from Deftco Corp. in the summer of 2009, although the loan was not closed.  This is insufficient, especially in light of Defendant's failure to obtain financing despite pursuit of over 100 lenders, brokers, and other funding sources from 2004 to 2009.

With regard to market demand, Defendant does not appear to dispute that market demand as of July 1, 2010 was weak for high-priced condominiums, but Defendant contends that in three years—the minimum time needed to complete construction of Granby Tower—market conditions will improve and demand will be stronger.  In addition, Defendant asserts there are willing buyers looking to purchase developments that would start selling units three years or more from the time of sale.  Defendant's sole support for its position on market demand is an e-mail sent by Stuart Holtzman, who appears to be a real estate appraiser, to Plaintiff's appraiser Michael Rountrey.  In this e-mail, Mr. Holtzman states:

> People ARE in the market for mixed-use projects that will start
> selling in 18 months or more, which *could* include condos. . . . Again,
> on the other hand, many buyers of mixed use projects are looking at
> distressed properties and they are looking for below market
> purchases. . . . One could postulate that a savvy local developer, who
> really understands the future demand potential for that area, which
> might be good, would buy a property on the assumption that he might
> be selling condos in 24 months. . . . So, the demand [for
> condominium projects] on the affordable end is strong. *The demand
> on the luxury end is far less strong.*

(Emphasis added.) Not only is this e-mail part of deliberation between Mr. Rountrey and Mr.
Holtzman prior to Mr. Rountrey reaching his final conclusion, which is encapsulated in his
appraisal, but even taking the e-mail at face value, it is hardly a ringing endorsement for Defendant's
view. Moreover, it does not address whether buyers would be interested in purchasing the subject
property and developing Granby Tower. Defendant has not identified any potential purchasers of its
property, nor has it provided market data showing that demand for Granby Tower will be strong
three years or more from the date of taking.

 The report of Defendant's appraiser, Heyward M. Cantrell, does not help Defendant meet its
burden to demonstrate financial feasibility. Mr. Cantrell cited the 124 sales contracts for
condominiums in Granby Tower as evidence of market demand, but the majority of those sales
occurred in 2005 and 2006; the rate of sales dropped off precipitously in 2007, and no sales were
made after January 2008. He also pointed to negotiations with potential retail and office tenants that
would have occupied sixty percent of the retail and office space, but there is no indication that the
potential tenants would have remained interested on the date of taking or that any commitments were
made. Finally, Mr. Cantrell analyzed market acceptance of residential condominiums by comparing
Granby Tower to five similar developments. The sales at the selected developments, however,
largely occurred prior to 2008, and are consequently less indicative of the demand for condominiums

in July 2010 or thereafter.  In fact, Mr. Cantrell observed that sales slowed significantly from 2008 to 2010 at Harbor Heights, The Rotunda, and The Westin.  After an initial burst of sales in early 2008, sales slowed significantly at Studio 56 Lofts in 2009, and no sales were reported in 2010.  The final comparable development, 388 Boush, sold out in August 2008.  Thus, Mr. Cantrell's analysis tends to indicate *low* market demand for condominiums as of the date of taking.  Mr. Cantrell's report does not address the availability of financing.

Defendant cannot rely on the opinion of its appraiser Richard Marchitelli because he improperly took into account the influence of the government project in his determination of the financial feasibility of the continued development of Granby Tower.  Mr. Marchitelli apparently analyzed the financial feasibility of Granby Tower in the period prior to 2008, under the theory that Granby Tower would have been built if not for the threat of government condemnation.  After 2008, Mr. Marchitelli commented that the economy fell into a serious recession and the real estate market weakened; I am unsure of his opinion on the financial feasibility of Granby Tower as of the date of taking.[6]

Because Defendant has not adequately supported its assertion that the continued development of Granby Tower is the highest and best use of the property as of the date of taking, I will exclude all valuation and other evidence that is based on the development of Granby Tower as the highest and best use.

**IV. PLAINTIFF'S RULE 71.1(H) MOTION TO EXCLUDE DEFENDANT'S VALUATION EVIDENCE OF DEFENDANT'S $22 MILLION CONTRACT WITH THE CITY, ENTREPRENEURIAL INCENTIVE, AND COSTS (DOCKET NO. 141)**

### A. Grant Agreement with City of Norfolk

On April 17, 2007, the Economic Development Authority of the City of Norfolk and Defendant entered into a "Grant Agreement" whereby the City agreed to pay Defendant up to $22 million to induce it to complete development of Granby Tower. The grant was to be paid to Defendant in a single payment within thirty days after the satisfaction of certain benchmarks. Defendant's rights under the grant agreement could not be assigned.

Defendant's appraisers considered this grant in determining the value of the property under the cost approach to appraisal. Plaintiff moves to exclude all valuation evidence based on the inclusion of the development grant in its computation. Plaintiff argues that, because the government did not "take" the grant, the value of the contract is not compensable in a condemnation proceeding.

Frustration of contract is not compensable in a federal eminent domain case. *Omnia Commercial Co. v. United States*, 261 U.S. 502, 511-13 (1923). Defendant maintains that the grant is a form of property, rather than a contract. In federal condemnation cases, the meaning of "property" is defined by reference to local law. *Powelson*, 319 U.S. at 279. Defendant argues that the grant agreement is a covenant that runs with the land, or is a "right" in real estate according to Virginia Code § 25.1-100. This argument fails because the grant is not assignable. The Grant Agreement embodies a specific arrangement between the city and Defendant to develop a specific project, namely Granby Tower. It is clear from the agreement that the parties did not intend for the

---

[6] Mr. Cantrell's determination of highest and best use may also be compromised by consideration of project influence. Mr. Cantrell's analysis of the property had been prepared "as if there had been no project influence by the federal government, and that typical market forces of supply and demand would have dictated development patterns *and highest and best use of the site*." (Emphasis added.) He also commented that "[h]ad it not been for the negative project

development grant to run with the land, as would be required to enforce the agreement as a covenant under Virginia law.  *See Sonoma Dev., Inc. v. Miller*, 258 Va. 163, 167, 515 S.E.2d 577, 579 (1999).  For these reasons, all valuation evidence based on the inclusion of the development grant will be excluded from consideration at trial.

### B.  Entrepreneurial Incentive

Plaintiff moves to exclude all of Defendant's valuation evidence that is based on the inclusion of an entrepreneurial incentive.  Entrepreneurial incentive is an element of the cost approach to performing an appraisal, which is defined as follows:

> A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, *including an entrepreneurial incentive*, deducting depreciation from the total cost, and adding the estimated land value.  Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised.

THE DICTIONARY OF REAL ESTATE APPRAISAL 47 (5th ed. 2010) (emphasis added).  The cost approach reflects the notion that one will not pay more for an existing property than it would cost to construct one's own replacement for the property.  Entrepreneurial incentive is defined as "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." THE APPRAISAL OF REAL ESTATE 388 (13th ed. 2008).  A developer will not construct a replacement of a property without compensation.  Entrepreneurial incentive is estimated based on market research and data, "usually through interviews with developers and other market participants about anticipated, acceptable, and actual levels of profit achieved in the market." *Id.* at 389.

---

influence of the Federal Government, pre-sales for the subject units would have been significantly higher."

Defendant's appraisers considered entrepreneurial incentive in their valuations under the cost approach. Mr. Cantrell determined that the entrepreneurial incentive should be twenty percent of the sum of the direct and indirect development costs incurred as of the date of taking, which resulted in an entrepreneurial incentive valued at $3,369,600. Based upon his experience and following appraisal practice and methodologies in comparable projects, Mr. Cantrell estimated that entrepreneurial incentive typically ranges between five percent and twenty percent of development costs. He selected twenty percent as the applicable rate in this case. Mr. Cantrell opined that the entrepreneurial incentive figure represents the value added to the property from the developer's coordination of activities associated with the acquisition, planning, marketing, and construction of the building.

Mr. Marchitelli determined that the entrepreneurial incentive should be fifteen percent of the sum of the direct and indirect development costs incurred as of the date of taking, as well as of the land value, which resulted in an entrepreneurial incentive valued at $3,930,000. Mr. Marchitelli rounded that figure to $3,900,000. Based upon a national real estate investor survey and interviews with developers of vacant land, Mr. Marchitelli estimated that entrepreneurial incentive typically ranges between ten percent and twenty-five percent of development and land costs. He selected fifteen percent "as a reasonable and appropriate entrepreneurial incentive to apply to this situation." Mr. Marchitelli opined that the entrepreneurial incentive figure represents the value added to the property for identifying the property and investment opportunity and coordinating construction, financing, and sales.[7]

Insofar as the entrepreneurial incentive factored into Defendant's appraisals measures the

_____

[7] Mr. Marchitelli employed the sales comparison approach to value the land. To the extent that this valuation captured the value added to the property from its assemblage into one parcel, this value should not be counted twice by

lost profits of Defendant, Plaintiff argues it should be excluded under Supreme Court precedent. *See*, *e.g.*, *Petty Motor*, 327 U.S. at 377 ("Since 'market value' does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits . . . [is] refused in federal condemnation proceedings."). The Supreme Court has yet to address the propriety of entrepreneurial incentive in the cost approach to valuation. Because the compensation due an entrepreneur or developer for assuming the risk of a development project and coordinating and managing the development is a real cost to constructing a replacement for the existing property, inclusion of entrepreneurial incentive may be necessary to ensure the accuracy of the cost approach valuation methodology. The goal of the cost approach is to estimate the market value of the property. Thus, consideration of entrepreneurial incentive comports with current law.

Plaintiff also argues that Defendant's appraisers did not base entrepreneurial incentive on objective market evidence from the Norfolk market. At this stage in the proceedings, I find that the appraisers' opinions are sufficiently supported by market research to allow them to be disclosed at trial. Of course, I reserve the right at trial to exclude any aspects of their opinions that lack proper foundation. Plaintiff can also address any weaknesses in the support for the appraisers' opinions through cross-examination.

Although entrepreneurial incentive can be an appropriate, even necessary, element of the cost approach methodology, the calculation of entrepreneurial incentive in this matter has probably been skewed by the assumptions of Defendant's appraisers that the highest and best use of the property is for the continued development of Granby Tower, and that the federal government's project influenced the market value of the property. The compensation due a developer for partial

its inclusion in the entrepreneurial incentive. On the current record, I cannot make a firm determination in this regard.

construction of a luxury condominium high-rise positioned as the premier offering in the regional market on the scale of the proposed Granby Tower is likely to be different from that due a developer for partial construction of the underpinnings of a high-rise building. *See* THE APPRAISAL OF REAL ESTATE 389 (13th ed. 2008) ("The range of profit will vary for different types of structures and with the nature or scale of a given project. The entrepreneurial incentive for a proposed development may be higher where creative concepts, greater risk, or unique opportunities have market acceptance. Less risky, more standard competitive projects may merit a lower measure of profit."). To give one example, in his deposition, Mr. Cantrell justified his selection of twenty percent of development costs as the rate for determining entrepreneurial incentive by referring to Defendant's accomplishment of marketing the condominium sales contracts and developing the architectural plans. That justification is not applicable because completing Granby Tower is not the highest and best use of the property.

I do not know whether Defendant's appraisers will advance these calculations of entrepreneurial incentive in light of my findings on project influence and highest and best use. Although I am prepared to receive evidence of entrepreneurial incentive at trial, if Defendant does seek to introduce these estimates of entrepreneurial incentive, the parties will need to develop the record more fully at that time so that a final determination can be made as to whether the estimates depend in any way on Granby Tower as the highest and best use of the property or on the influence of the government project. The estimates will be scrutinized to ensure that they do not take into account any improper considerations.

## C. Costs

Plaintiff moves to exclude all of Defendant's valuation evidence employing the cost approach that was based on costs not independently verified and not founded upon objective market data. Plaintiff asserts that both appraisers merely relied on the costs provided to them by the landowner, and failed to determine how the Norfolk market would consider what value, if any, they contributed to the subject property.

Based upon my review of the pertinent materials in the record, I conclude that there is adequate support for the cost information used in Defendant's valuation evidence to allow the evidence to be presented at trial, provided a proper foundation is laid. This may be a hollow victory for Defendant. All valuation evidence based on the development of Granby Tower as the highest and best use is inadmissible, as well as any opinions based on an assumption that the government project influenced the development of Granby Tower. A cursory review of Mr. Cantrell's list of costs reveals costs not likely to be relevant under a different highest and best use, such as several of the line-item marketing costs. On the information presently before the Court, I cannot determine which costs, if any, are improper on this basis.

## V. PLAINTIFF'S MOTION FOR SPOLIATION INSTRUCTION, EVIDENCE PRECLUSION AND RELATED RELIEF (DOCKET NO. 139)

Plaintiff moves for evidentiary relief in the form of a narrow spoliation instruction and preclusion of evidence due to Defendant's alleged failure to preserve evidence relevant to the viability of its planned development of the property prior to the initiation of the case on July 1, 2010. Specifically, Plaintiff seeks (1) "a jury instruction on adverse inference, stating that Defendant failed to retain documents it should have retained . . . and that the jury is free to infer that Defendant did so because their contents were adverse to Defendant" and (2) "to preclude testimony from

Defendant and Marathon regarding the feasibility of the planned Granby Tower development prior to July 1, 2010—including potential financing and condominium sales or demand information for Granby Tower—and the failure of the project and the reasons therefor." Pl.'s Mot. for Spoliation Instruction at 3. Plaintiff claims that Defendant's alleged failure to preserve evidence "has prejudiced the United States' ability to rebut Defendant's factual allegations that but for the pre-condemnation actions of the United States starting in 2005, Granby Tower would have sold out, obtained financing, and successfully reached completion." *Id.* at 2-3. Plaintiff states that if the Court precludes all evidence regarding alleged government interference, project influence, and the feasibility of Granby Tower prior to July 1, 2010, on other grounds, its motion for a spoliation instruction and evidence preclusion would be moot.

Because all evidence regarding government interference and project influence and all valuation and other evidence based on the development of Granby Tower as the highest and best use is excluded from consideration at trial for the reasons stated in this opinion, I will deny this motion as moot.

## VI. CONCLUSION

For the reasons stated above, the following will be ordered:

- Defendant's Motion for Ruling on the Scope of the Project Rule (docket no. 136) will be DENIED.

- Plaintiff's Rule 71.1(h) Motion to Exclude from Evidence Allegations of Government Interference and Project Influence (docket no. 137) will be GRANTED. Allegations and evidence of government interference and project influence prior to

the date of taking will be excluded from trial, as well as any valuation evidence that depends on the existence of project influence for its support.

- Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Highest and Best Use (docket no. 142) will be GRANTED. All valuation and other evidence that is based on the development of Granby Tower as the highest and best use will be excluded.

- Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Valuation Evidence of Defendant's $22 Million Contract with the City, Entrepreneurial Incentive, and Costs (docket no. 141) will be GRANTED IN PART and DENIED IN PART. All valuation evidence based on the inclusion of the development grant between the City of Norfolk and Defendant will be excluded.

- Plaintiff's Motion for Spoliation Instruction, Evidence Preclusion and Related Relief (docket no. 139) will be DENIED as moot.

The remaining motions (docket nos. 130-35, 140) will be taken under advisement pending further argument from counsel.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this __25th__ day of April, 2011.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE